# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Ronda Nierengarten, Jessica Walz, and Emily Knobel, <br><br> *Plaintiffs*, <br><br> *vs* <br><br> The Mayo Clinic, a Minnesota non-profit corporation; Mayo Clinic Health System – Southwest Minnesota Region, Inc., a Minnesota non-profit corporation; Mayo Clinic Health System—Northwest Wisconsin Region, a Wisconsin non-stock corporation, <br><br> *Defendants*. | Court File No. 23-cv-0144 <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Ronda Nierengarten ("Plaintiff Nierengarten"), Plaintiff Jessica Walz ("Plaintiff Walz"), and Plaintiff Emily Knobel ("Plaintiff Knobel"), make the following allegations for their complaint against the Defendant Mayo Clinic ("Defendant Mayo"), Mayo Clinic Health System – Southwest Minnesota Region, Inc. ("Defendant Mayo Southwest"), and Mayo Clinic Health System—Northwest Wisconsin Region, a Wisconsin non-stock corporation ("Defendant Mayo Northwest") (all Defendants are collectively referred to as "Defendants").

## INTRODUCTION

1.      In October, 2021, Defendant Mayo mandated that all of its employees, including those of its related entities such as Defendant Mayo Southwest, and Defendant

Mayo Northwest, receive the Covid-19 vaccination as a condition of continuing their employment ("Vaccine Mandate").  Many of Defendants' employees, including Plaintiffs, objected to receiving these vaccinations because of their sincerely-held religious beliefs.  Plaintiffs filed requests for religious exemptions with Defendants to be exempt from taking the Covid-19 vaccination.  Defendants denied the requested exemption, or in the case of several Plaintiffs, granted the exemption but conditioned it upon Plaintiffs undergoing testing and signing a release of medical information to allow third parties access to their medical information.  In addition, Defendants failed to undertake an individual interactive process as required for evaluating religious exemption requests.  Finally, only a couple of weeks after terminating Plaintiffs, Defendants reversed the testing program part of its Vaccine Mandate, demonstrating that the terminations were unnecessary or a pretext.

2.     Based on Defendants' implementation of the Vaccine Mandates and their refusal to grant Plaintiffs their requests for a religious exemptions, Plaintiffs bring these claims under Title VII for religious discrimination, the Americans with Disabilities Act ("ADA"), related state claims under the Minnesota Human Rights Acts for religious discrimination and disability discrimination, and breach of contract, based on Defendant Mayo mandating a vaccine.

## JURISDICTION AND VENUE

3.     Plaintiffs have fulfilled the jurisdictional requirements of Title VII of the Civil Rights Act of 1964 and the ADA, including filing of Charges with the EEOC, and the receipt of a right-to-sue letters from Equal Employment Opportunity Commission

("EEOC") following closure of the EEOC file, all in compliance with 42 U.S.C. §2000e-5(f)(1).

4.      This Court has original subject matter jurisdiction over this case, as it raises claims pursuant to federal statute, pursuant to 28 U.S.C. §1331. This Court further has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

5.      This Court has personal jurisdiction over Defendant Mayo as an entity as it is a non-profit corporation operating in and located in the State of Minnesota.

6.      This Court has personal jurisdiction over Defendant Mayo Southwest as an entity as it is a Minnesota non-profit corporation.

7.      This Court has personal jurisdiction over Defendant Mayo Northwest as a Wisconsin non-stock corporation operating in and located in the State of Wisconsin.

8.      Defendant Mayo is subject to the provisions of Title VII and the ADA because Defendant Mayo employs more than fifteen employees in each of twenty or more calendar weeks in the current or preceding calendar year under 42 U.S.C. §2000e (b) and 42 U.S.C. §12111 (5)(A).

9.      Defendant Mayo Southwest is subject to the provisions of Title VII and the ADA because Defendant Mayo Southwest employs more than fifteen employees in each of twenty or more calendar weeks in the current or preceding calendar year under 42 U.S.C. §2000e (b) and 42 U.S.C. §12111 (5)(A).

10.      Defendant Mayo Northwest is subject to the provisions of Title VII and the ADA because Defendant Mayo Northwest employs more than fifteen employees in each

of twenty or more calendar weeks in the current or preceding calendar year under 42

U.S.C. §2000e (b) and 42 U.S.C. §12111 (5)(A).

11.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(e)(1)

because the actions giving rise to this cause of action occurred in Minnesota, and

Defendant Mayo conducts business in the State of Minnesota.

## PARTIES

12.     Plaintiff Nierengarten is presently an Arkansas resident and a former

employee of Defendant Mayo who worked as a pharmacy technician in Rochester,

Minnesota.  Plaintiff Nierengarten worked for Defendant Mayo for 14 years.

13.     Plaintiff Walz is a resident of Martin County, Minnesota who worked for

Defendant Mayo Southwest, in Minnesota, as a radiologic technologist.  Plaintiff Walz

worked for Defendant Mayo Southwest for three and one-half years.

14.     Plaintiff Knobel is presently a Montana resident who worked for Defendant

Mayo Northwest in Wisconsin, as a nurse practitioner.

15.     Defendant Mayo is a Minnesota non-profit corporation headquartered in

Minnesota which operates medical facilities in Minnesota.

16.     Defendant Mayo Southwest is a Minnesota non-profit corporation.

17.     Defendant Mayo Northwest is a Wisconsin non-stock corporation which

operates medical facilities in Wisconsin.

## FACTS

18.     During the pandemic in 2020 and 2021, Plaintiffs were asked to work their

own and frequently additional shifts in order to cover the increase in treatment and care

4

for patients during the height of the Covid-19 pandemic.  At that time, Plaintiffs, while unvaccinated, continued to provide patient care while employed by Defendants.

19.     When Covid-19 vaccines first became available in December 2020 Defendants encouraged, but did not require their employees to get vaccinated, and Plaintiffs continued to work throughout 2020 and 2021 while unvaccinated.

20.     Defendants recognized in November 2020, in the words of Dr. Gregory Poland, head of Mayo's Vaccine Research Group, that "*we can't mandate that people take a vaccine, it's their right not to take one*."

21.     Again in December 2020 Defendants recognized that "*vaccination is voluntary*."

22.     Defendants also recognized that some of their employees would have religious objections to taking the vaccine, and accordingly, Defendants had a policy until September 2021 of granting all or nearly all requests for religious exemptions.

23.     In litigation in October 2021, Defendant Mayo boasted that it granted 90% of requests for religious exemptions, and because it was so lenient in granting requests for religious exemptions, the Defendant argued that the Plaintiffs in that case had no standing because it was unlikely they would be terminated or would suffer any negative consequences as a result of Defendant Mayo's Vaccine Mandate.

24.     Defendants recognized the important work that all of their employees were doing—the unvaccinated and the vaccinated—and on September 28, 2021 the President and CEO of Mayo Clinic (Gianrico Farrugia, M.D.), along with the Chief administrative Officer (Jeff Bolton) wrote to Mayo's employees:

>   *On behalf of the leaders of Mayo Clinic's sites and shields, thank you for the compassionate care you provide to our patients, your excellent service to Mayo Clinic, and the supportive and collaborative environment you create for all of our colleagues.  We truly appreciate you and your efforts to live our values every day.*

25.     However, just two weeks later, Defendants implemented their Vaccine Mandate.  The Vaccine Mandate stated that "*all Mayo Clinic staff members*" must get vaccinated with one of the Covid-19 vaccines or else the employees would be considered "*noncompliant,*" later "*placed on unpaid leave,*" and eventually "*terminated.*"  The Vaccine Mandate applied to "*all staff, including remote workers,*" of which Defendants had many.  Recognition of the important work performed by the unvaccinated employees disappeared only two weeks after being celebrated.

26.     Defendants announced the Vaccine Mandate on October 13, 2021.  Defendants' changed policy required all staff to become vaccinated against Covid-19, and that if they were not already vaccinated or only partially vaccinated, they would have to become vaccinated or be approved for a medical or religious exemption by December 3, 2021, or be terminated.

27.     On October 25, 2021 Defendants sent a communication to their employees outlining the steps to comply with the Covid-19 vaccination policy.  Beginning on December 3, 2021, Defendants issued Final Written Warnings to noncompliant staff with instructions on complying by January 3, 2022, or be terminated.

28.     Defendants announced that there were both medical and religious exemptions from the Vaccine Mandate, and did allow for employees to apply for

"medical and religious exemptions" to the Vaccine Mandate, and even provided "forms" for such applications.

29.     However, what Defendants gave with one hand, they took away with the other by proclaiming that "*it is anticipated that a <u>small number of staff</u> will have qualifying religious exemption*."  (emphasis added).  Further, Defendants declared: "*[o]nly a <u>small number of staff</u> are expected to qualify for a religious exemption*." (emphasis added).

30.     Defendants printed and distributed this message that it would only grant a "*small number*" of the religious exemptions, as it simultaneously argued the opposite in Federal Court in Minnesota.  Defendant Mayo argued in Federal Court that Plaintiffs alleging to be harmed as a result of the newly implemented Vaccine Mandate had no justiciable controversy, no standing, and the Court had no subject matter jurisdiction because Defendant Mayo granted nearly all requests for religious exemptions, and therefore few or no employees would actually be terminated.  Defendant Mayo argued that "*the only competent record evidence show that current Mayo employees' declinations [requests for exemption to vaccine] will not be 'denied,'*" and that "*Mayo has granted 90% (27 of 30) of new employees' requests for religious exemptions.*" *Def. Mayo Memo in Opp. To Mot. For TRO, filed October 8, 2021.*[1]

---

[1] *Mary Roe 1, et al., v. Allina Health Systems, et al*., (including Mayo Clinic), Case 0:21-cv-02127, filed October 8, 2021.  Defendant Mayo also wrote that it "*has not terminated or threatened to terminate any employee for failing to obtain Covid-19 vaccination or seeking an exemption,*" pp. 5-6; "*all but one [of the plaintiffs] have requested exemptions that, if granted, will allow them to remain unvaccinated and employed,*"  pp. 7-8;  "*they [unvaccinated Mayo employee plaintiffs] have not suffered any harm and may never*

31.     In Federal Court, Defendant Mayo succeeded in convincing the Court there was no subject matter jurisdiction, because unvaccinated employees had not been terminated as of that time (October 2021), and likely would not be terminated because of Defendant Mayo's generous granting of religious exemptions.  As a result of Defendant Mayo's representations to the Court, Defendant Mayo obtained dismissal without prejudice of the Complaint in that case.

32.     Shortly after achieving victory in Court on the basis that it had generously granted 90% of the requests for religious exemptions, Defendants then switched to their new position that they would grant only a "*small number*" of the requests for religious exemptions, and terminate those employees who refused to receive the vaccine. Defendants then denied Plaintiffs' requests for a religious exemption—in most cases without even talking to the Plaintiffs about their religious beliefs—and then terminated Plaintiffs, representing a complete change in Defendants' company policies and a switch from their representations to the Court in the Federal Court litigation in Minnesota.

33.     Defendant further wrote: "*applications for a religious exemption will be denied if the panel determines the applicant <u>does not demonstrate a sincerely held religious belief</u>*, (emphasis added).  Defendants thus put themselves in the position of deciding the sincerity of the religious belief of their employees, including Plaintiffs and, whether those beliefs were "religious" or not, and "sincere" or not.  Defendants exercised

---

*suffer any harm*," p. 8, 10; "*Plaintiffs cannot secure standing with vague allegations that exemptions under some (unidentified) vaccination policies are 'narrow' and 'limited*,'" p. 11; and "*rank speculation that an exemption could be denied does not confer standing.*" P. 11. (emphasis in original).

this determination of the sincerity of Plaintiffs' religious beliefs without ever interviewing the Plaintiffs or discussing with Plaintiffs their religious beliefs.

34.    Defendants also expressed limitations to the "*medical exemption*" to the Vaccine Mandate by stating: "*The only absolute medical contraindications to vaccination for COVID-19 are severe or immediate reaction to a prior dose of the vaccine, known allergy to a vaccine component, or a preexisting and clinically diagnosed fear of needles*."  Other medical conditions were preemptively discounted, or disregarded, and its physicians were ordered to ignore their clinical judgment (in violation of their oath and ethical duties as physicians) and limit their medical exemptions to these issues only.

35.    The planned limitations on their religious and medical exemption policies were supposed to be kept secret, as Defendants wrote to the high-ranking personnel who implemented the policies: "*This message is intended for regional supervisors, managers and other leaders, so please do not share broadly*." (emphasis added).

36.    Consistent with Defendant Mayo's instructions that employees could request a religious exemption to the Covid-19 Vaccine Mandate, Plaintiff Nierengarten requested a religious exemption from Defendant Mayo that Defendant Mayo denied. Plaintiff Nierengarten also submitted a request for reconsideration, which Defendant Mayo also denied.  Defendant Mayo did not provide Plaintiff Nierengarten with the criteria it used in evaluating her request for a religious exemption, nor did Defendant Mayo provide specific information regarding the reasons for the denial of Plaintiff Nierengarten's request for a religious exemption.

37.     Plaintiff Nierengarten is a Christian who believes her body is a Temple of the Holy Spirit, and that she must care responsibly for her body, honor God with it, and not defile her body.  She believes she must not allow any unwanted intrusions into her body.  She also believes that she is to use her body for God's purposes, and should not engage in medical treatments that she believes could be detrimental to her body, or which could potentially alter her body.  She believes that she must be careful with medical treatments that are ethically questionable, and which may treat the body by modifying the body's genetics or immune system, which the Covid-19 vaccines do.  She believes that receiving the Covid-19 vaccination would violate the Bible's command to honor God with her body, as expressed to her through Biblical principles, prayer and the direction of the Holy Spirit.  She believes that God specifically answered her prayer instructing him not to take the vaccine.

38.     Plaintiff Nierengarten received positive job performance reviews from Defendant Mayo, including a 2020 job performance review in which her supervisor/manager wrote: "Ronda has played an integral position in the pediatric pharmacy for many years.  … She is an excellent CSP tech … Thank you Ronda for the excellence and professionalism you have given Mayo Clinic Department of Pharmacy for the past 13 years."

39.     Plaintiff Nierengarten sought an accommodation to continue working as she had for the prior year and a half with no undue hardship to Defendant.  Plaintiff Nierengarten proposed to continue working, but masking, self-screening, and washing

hands, and if she developed any Covid-19 type symptoms she would stay home. Defendant Mayo did not respond to this request for accommodation.

40.     Plaintiff Nierengarten is familiar with persons who have taken the Covid-19 vaccines and become ill shortly after taking the vaccines.  Many of Plaintiff Nierengarten's co-workers got ill shortly after taking the vaccines and missed work because of those illnesses.  Plaintiff Nierengarten rarely missed work during her tenure working for Defendant Mayo.

41.     Plaintiff Nierengarten was terminated when she was 51 years of age, and was at the higher end of the pay scale for her position.

42.     Consistent with Defendant Mayo Southwest's instructions that employees could request a religious exemption to the Covid-19 Vaccine Mandate, Plaintiff Walz requested a religious exemption from Defendant Mayo Southwest which Defendant Mayo Southwest denied.  Plaintiff Walz also submitted a request for reconsideration of the denial of her request for a religious exemption, but Defendant Mayo Southwest denied that request for reconsideration also.  Defendant Mayo Southwest did not provide Plaintiff Walz with the criteria it used in evaluating her request for a religious exemption, nor did Defendant Mayo Southwest provide specific information regarding the reasons for the denial of Plaintiff Walz's request for reconsideration.

43.     Plaintiff Walz is a Christian who believes in the sanctity of human life.  She also believes that her body is a Temple of the Holy Spirit and is sacred.  Plaintiff Walz believes that she must control what is placed in her body, God's Temple, and honor God with how she treats her body and what she puts into it.  She also objects to receiving the

11

vaccine because they are produced with, or tested with, cells from aborted babies. To receive the vaccine would violate her sincerely held religious belief that life is sacred. For Plaintiff Walz to receive the vaccine would violate her sacred identity and relationship with God.

44.     Plaintiff Walz has had numerous positive job performance reviews, noted that she "achieves expectations," that she "is a hard worker," and is "always doing work or helping out her co-workers."   She received awards such as the Excellence Award, and received letters of recommendation from her co-workers at Defendant Mayo Southwest when she was terminated by Defendant Mayo Southwest. Her supervisor wrote that she "has a strong work ethic and always goes above and beyond in her position. … She is a team player and would make a great asset to any organization."

45.     Plaintiff Walz sought an accommodation to continue working as she had for the prior year and a half without causing any issues with Defendant. Plaintiff Walz proposed to continue working, but masking, self-screening, and washing hands, and if she developed any Covid-19 type symptoms, she would stay home. Defendant Mayo did not respond to this request for accommodation.

46.     Plaintiff Walz is familiar with people who have taken the Covid-19 vaccines and become ill shortly after taking them. Some co-workers received the vaccine and became ill within hours or the next day. The majority of Plaintiff Walz's co-workers missed work in the days following receiving the vaccine, and many of them planned to miss work after receiving the vaccine. Several of Plaintiff Walz's relatives got ill shortly

after receiving the vaccine, including fatigue, and other flu-like symptoms such as runny nose, fever, and nausea.

47.    Plaintiff Walz contracted Covid-19 in January 2021 and recovered, which provided her with natural immunity.

48.    In her department, six employees applied for religious exemptions, and all of those were denied, with the exception of the lead technologist, whose request for a religious exemption was granted.

49.    Consistent with Defendant Mayo Northwest's instructions that employees could request a religious exemption to the Covid-19 Vaccine Mandate, Plaintiff Knobel requested a religious exemption from Defendant Mayo Northwest that Defendant Mayo Northwest denied. Plaintiff Knobel also submitted a request for a medical exemption because she was pregnant, which Defendant Mayo Northwest also denied.  Defendant Mayo Northwest did not provide Plaintiff Knobel with the criteria it used in evaluating her request for a religious exemption, nor did Defendant Mayo Northwest provide specific information regarding the reasons for the denial of Plaintiff Knobel's request for a religious exemption.

50.    Plaintiff Knobel is a fundamental Christian who believes her body is a Temple of the Holy Spirit, and that she must care responsibly for her body, honor God with it, and not defile her body.  She believes she must not allow any unwanted intrusions into her body.  She also believes that she is to use her body for God's purposes, and should not engage in medical treatments that she believes could be detrimental to her body, or health.  She believes that she must be careful with medical treatments that are

ethically questionable, and which may treat the body by modifying the body's genetics or immune system. She believes that receiving the Covid-19 vaccination would violate the Bible's command to honor God with her body, as expressed to her through Biblical principles, prayer and the direction of the Holy Spirit. She also objects to receiving the vaccine because they are produced with, or tested with, cells from aborted babies. Plaintiff Knobel also believed that she had an obligation to God to protect her unborn baby for the same reasons as she had for herself. To receive the vaccine would violate her sincerely held religious belief that life is sacred. She believes that God specifically answered her prayer instructing her not to take the vaccine.

51.     Plaintiff Knobel proposed to continue working as she had for the prior one and one-half years, which was to mask, and engage in other hygiene and safety protocols associated with her job as a trauma nurse practitioner at all times.

52.     Plaintiff Knobel had received positive job performance reviews.

53.     Plaintiff Knobel is familiar with many people who got sick shortly after receiving the Covid-19 vaccine. Some of them were co-workers, some were family members, and some were patients. Defendant Mayo allowed vaccinated employees to take time off after receiving the vaccine because so many employees were reporting illnesses immediately after receiving the Covid-19 vaccines.

54.     After Defendants denied Plaintiffs' requests for religious exemptions, Defendants also warned the Plaintiffs: "*Do not distribute, forward, or copy the content of this notification.*"

55.     Defendant Mayo terminated Plaintiff Nierengarten's employment on January 3, 2022 based on her refusal to take the Covid-19 vaccine.  Plaintiff Nierengarten filed a charge of religious and age discrimination with the EEOC and received a Right to Sue letter from EEOC on October 21, 2022.

56.     Defendant Mayo Southwest terminated Plaintiff Walz on January 3, 2022.  Plaintiff Walz filed a charge of religious discrimination against Defendant Mayo Southwest with the EEOC.  Plaintiff Walz received a Right to Sue letter from the EEOC dated October 28, 2022.

57.     Defendant Mayo Northwest terminated Plaintiff Knobel's employment on January 3, 2022 based on her refusal to take the Covid-19 vaccine.  Plaintiff Knobel filed a charge of religious discrimination with the EEOC and received a Right to Sue letter from EEOC dated November 3, 2022.

58.     Defendants created an ad hoc panel to review such exemption requests, but kept the identity of the panelists secretive, so as to prevent examination of the guidelines and criteria Defendants used in evaluating the requests for religious exemptions.  Defendants wrote: "*individual names [of the ad hoc panelists] are confidential and will not be shared*."

59.     Plaintiffs have sincerely held religious beliefs, and submitted requests for exemptions, but Defendants accepted very few religious exemptions, with the exception that some were granted, but conditioned upon submission to invasive, supervised weekly testing despite the fact that the vaccinated and unvaccinated contracted and transmitted both the Delta and Omicron variants at similar rates.

15

60.     Defendants' forms for requesting religious exemptions was written in a deceptive way to force applicants into accepting false statements as true, and then trying to force applicants for religious exemptions into admitting "inconsistencies" that Defendants could use to deny the request for religious exemptions.

61.     As a result of Defendant Mayo's policy on restricting religious and medical exemptions, very few people qualified for those exemptions, resulting in mass terminations for those employees, including Plaintiffs, who refused the Covid-19 vaccination or to undergo testing, and whom Defendants terminated as a result.

62.     The Plaintiffs proposed reasonable accommodations to Defendants, such as wearing a mask, self-monitoring for symptoms, and voluntarily reporting symptoms and quarantining as necessary.

63.     Plaintiffs had worked for approximately one and one-half years during the Pandemic prior to the Vaccine Mandate, and Plaintiffs had fully performed their employment duties and even obtained positive and glowing job performance reviews, without being discriminated against.

64.     None of the Plaintiffs have been determined to have transmitted Covid-19 to other employees or patients.

65.     Defendant Mayo's denials of requests for religious exemptions all contained the same boilerplate language:

> *Thank you for submitting your request for religious exemption. The information you provided was carefully considered. While this may not be the news you were hoping to receive, your religious accommodation has not been approved. Based on the information*

> *provided, your request did not meet the criteria for a religious exemption accommodation.*

66.     Defendants engaged in no case-by-case analysis or individualized interactive process to discuss Plaintiffs' exemption requests or possible accommodations. In response to requests for explanation or information, Defendants wrote: "*HR is not able to share what criteria was used to review/approve the exemption. A small team of employees reviewed each request and based on what was provided to them from each individual employee is what was used in the approval/denial decision.*"

67.     Rather than engaging in a legitimate interactive process, respecting the sincerity of Plaintiffs' religious beliefs, or attempting reasonable accommodation, Defendants used more boilerplate language to justify their pre-determined result:

> *Generally, denials occur because the requestor has not clearly stated their sincerely held belief, demonstrated it is a sincerely and consistently held belief, and/or clearly defined the conflict between their religious belief and receiving the COVID-19 vaccine.*

68.     Defendants actually specifically disavowed an individual interactive process by writing: "*Specific feedback on individual requests will not be provided,*" and "*it is not possible to provide individual feedback.*"

69.     Plaintiffs sought further clarification on Defendants' criteria for determining whether a religious belief constituted a "sincerely held religious belief," and the basis for Defendants determining that Plaintiffs did not have a "sincerely held religious beliefs," but the Plaintiffs were simply given the generalized, identical language in the letters.

70.     In its form denial letters, Defendants announced that they would accept appeals of its uniform denial decisions. "*If you would like to submit additional clarifying information, you may submit a reconsideration request here*."  Plaintiffs took advantage of that process and submitted additional information supporting his request for exemption.

71.     Defendants required appeals to be made within 48 hours.  These denials were emailed and not hand delivered despite the fact that the employees' jobs were at stake.  Many employees did not have access to work email at home, and therefore may not have even gotten the notice of the denial of their request for the religious exemption until they returned to work, after the 48 hours had run.  Others were on vacation, or engrossed in work or family responsibilities when the notice of denial of their request for religious exemption came, and thus failed to make an appeal with the 48 hour period.

72.     Plaintiffs followed the appeal process but their requests for reconsideration were generally denied, with the exception of those whose exemption was conditioned on their undergoing testing and agreeing to release medical information to third parties. Defendants again issued identical denial letters to nearly every employee who appealed. The transmittal email messages stated: "*Unfortunately, the additional information you provided did not change the outcome as it did not meet the criteria for a religious accommodation*."  Again, no interactive process was used to evaluate the requests for exemptions.

73.     Defendants did not provide information about their process for determining whether Plaintiffs' religious beliefs were sincerely held or not, or whether Plaintiffs' sincerely held religious beliefs would be accommodated either.

74.     Both the original denial of the religious exemption and the denial of the requests for reconsideration contained this warning at the bottom: "*Do not disseminate, distribute, forward, or copy the content of this notification*."

75.     Defendants further instructed their staff to "*endorse the vaccine or say nothing.*"

76.      Each of the Plaintiffs submitted good-faith statements of their sincerely-held religious beliefs, with explanations of how their faith constrained them from accepting the Covid-19 vaccination.  Defendants' ad hoc panel nevertheless denied Plaintiffs' requests for an exemption and made no effort to accommodate the Plaintiffs' requests for religious exemptions.

77.     Defendants did grant religious exemptions to some of their employees. However, those religious exemptions were discriminatorily granted, and some employees whose religious exemptions were granted were required to undergo weekly testing for the Covid-19 virus.

78.     Defendants, in issuing their Vaccine Mandates, instructed that all of their employees must be "fully vaccinated," despite the fact that the phrase "fully vaccinated" has included receiving one shot, or two shots, and then discussion of three shots, and even additional, annual or more frequent shots.

79.     Defendants issued the Vaccine Mandate mandating their employees, including Plaintiffs, take the Covid-19 vaccine despite accumulating evidence that the Covid-19 vaccine does not provide protection as long lasting as had been previously represented, does not prevent infection or transmission, but only allegedly reduces the severity of Covid-19 if a person contracts Covid-19.

80.     On August 6, 2021, CDC Director Dr. Rochelle Walensky stated that vaccines against Covid-19 did not prevent transmission of the Covid-19 virus.[2]  This followed the CDC's updated guidance and Dr. Walensky's comments on July 27, 2021, recommending that everyone wear a mask in indoor public settings in areas of substantial and high transmission, regardless of vaccination status.  The CDC's *Morbidity and Mortality Weekly Report (MMWR)* stated that **Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus**."[3]

81.     Dr. Deborah Birx, the former White House Covid Response Coordinator, stated in July 2022: "*I knew these vaccines were not going to protect against infection. And I think we overplayed the vaccines …*".  Separately Dr. Birx also stated: "*When we*

---

[2] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. (last accessed November 8, 2022).

[3] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, Centers for Disease Control and Prevention (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (emphasis added). See also, https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. (last accessed November 8, 2022); https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html. (last accessed November 8, 2022).

*make broad statements, when we say to people that these vaccines are going to protect against infection – one, it wasn't studied,* …".

82.     Many of the national leaders, who proclaimed without evidence, that the Covid-19 vaccines would prevent infection, have suffered from Covid-19 *after* receiving the Covid-19 vaccine.  For example, President Biden, who has been vaccinated and boosted, has contracted Covid-19 at least twice.  Dr. Anthony Fauci, who has been vaccinated and boosted, has contracted Covid-19.  Center for Disease Control Director Dr. Rochelle Walensky has been vaccinated and boosted, yet tested positive for Covid-19 as recently as October 2022).

83.     Vaccination does not prevent infection or transmission of Covid-19, and the CDC no longer differentiates between vaccinated and unvaccinated individuals.[4]

84.     As of the date of filing this Complaint, the majority of people with Covid-19 have been vaccinated with one of the Covid-19 vaccines.

85.     A recent study indicates that people who took the Covid-19 vaccine are actually more likely to be hospitalized than people with natural immunity.

86.     The number of patients hospitalized because of Covid-19 positive status has also been overstated because many were hospitalized for other causes, not because of the Covid-19 infection.

87.     Similarly, the number of people who were counted as having died from Covid-19 were overstated because many of them died *with* Covid-19, not *from* Covid-19.

---

[4] https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html. (last accessed November 8, 2022).

88.     The number of Covid-19 deaths were also overstated by upwards of 25%, or even more, because many of those who died had multiple co-morbidities.

89.     Dr. Deborah Birx stated "[b]ut let's be very clear: 50% of the people who died from the Omicron surge were older, vaccinated."

90.     The VAERS system has documented that the vaccines themselves have numerous harmful side effects associated with them.  Some of these harmful side effects are included in the lists of side effects described right on the vaccine literature, and warned about in "Facts Sheets" on the CDC website.

91.     Thus, the extent of Covid-19 infections, the severity of the Covid-19 infection, the efficacy of the vaccines, and the time-length of vaccine protection may all have been overstated, contributing to an over exuberance in mandating vaccines, and punishing the unvaccinated, as Defendants have done as set forth above.

92.     Early on in the Covid-19 pandemic, and before any vaccines were available, Defendant Mayo provided free testing to determine "*how many Mayo Clinic staff have developed antibodies against SARS-Co-V-2.*" Defendant Mayo has subsequently stopped providing this testing because of the demonstrated superiority of natural immunity to vaccinated immunity, might encourage its employees to decline the vaccine.

93.     Rather than disclosing the results of its determination on the numbers of Defendants' "*staff*" that "*have developed antibodies against SARS-Co-V-2,*" or disclosing *studies on the "duration of immunity after Covid-19,*" (which some studies have asserted

are many times more effective than vaccine immunity), Defendants have not made public this information and instead issued the Vaccine Mandate.

94.     Further, Defendants quit providing the antibody testing—whether free or paid—which deprived Defendants of important information as to whether the vaccine was necessary for its employees in the first instance, whether Defendants' employees needed accommodation, and whether Defendants would incur any hardship by continuing to employ unvaccinated employees.

95.     The State of Minnesota ceased to be under a state-declared "emergency" over three months before Defendants instituted their Vaccine Mandate, as Governor Timothy Walz officially ended the State's emergency effective June 30, 2021.

96.     On March 8, 2022, Defendants announced they would suspend the testing program portion of the Vaccine Mandate.  As a result, Defendants' remaining unvaccinated employees are now treated similarly to vaccinated employees, but Plaintiffs were treated discriminatorily.

97.     After terminating the Plaintiffs, and discriminating against employees related to testing, Defendants suspended weekly testing effective March 14, 2022, which means that those who refused weekly testing and were terminated between January 2022 and March 14, 2022, would no longer be forced to test weekly, and would no longer be terminated for objecting to testing, which Defendants have now determined is unnecessary.

98.    After terminating the Plaintiffs for not receiving the vaccines, and in some cases before Defendants terminated the Plaintiffs, Defendant began hiring other, unvaccinated employees.

99.    The following seriatim list of facts which have been gathered by the Plaintiffs group suing Defendants which casts doubt on the legitimacy of the exemption process are as follows:

- The exemption process, and particularly the appeal process were under an unnecessary short timeframe negatively affecting the quality of the exemption submissions.  There was no reason for the unnecessary shortness of the timeframe.  During that period, Delta and Omicron were the dominant variants in October 2021/January 2022, and the Defendants and the CDC were aware that the Covid-19 vaccine did not materially prevent infection, or transmission of those Covid-19 variants during that time period.

- The antibody testing to determine prior Covid-19 infection, and infection resistance that the CDC determined was many times superior to vaccinated immunity was terminated over the objection of the workforce, and demonstrated that the purpose of the Vaccine Mandate was not to further patient safety.  The refusal to acknowledge that Covid-19 recovered immunity was superior to vaccinated immunity demonstrated that the process was not created with patient safety being a primary concern.

- Defendant Mayo terminated a mother of two daughters who introduced her daughters to their religious faith, while granting the religious exemptions of her lower paid daughters.

- Defendant Mayo terminated numerous spouses who went to church with their fellow spouse while granting the religious exemption of the other spouse, and in one such instance, and on information and belief, their exemption requests contained *the exact same language*.

- Defendant Mayo terminated some parishioners at a parish while granting the religious exemptions of others who attended the exact same parish.

- Defendant Mayo's lack of an interactive process favored superior writers over inferior writers, something which has absolutely no bearing on the sincerity of an exemption proponent's religious faith.

- Workers who were working remotely during their entire tenure, and who were absolutely no risk to their colleagues, or patients, were terminated, providing direct evidence that the entire exemption process was absurd and conducted in bad faith.

- Within two months of terminating Plaintiffs, Defendant Mayo was again hiring unvaccinated employees, demonstrating further that the purported reasons for the vaccine mandate were not patient safety and that the stated reasons for Plaintiffs' terminations were a pretext.

## FIRST CAUSE OF ACTION

### Religious Discrimination and Failure to Accommodate under
### Title VII of the Civil Rights Act of 1964

100.   Plaintiffs restate and reallege all previous allegations as if fully set-forth herein.

101.   Each Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

102.   Each Plaintiff is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

103.   Each Plaintiff has a sincerely held religious belief which prevented them from receiving the vaccine.  Plaintiffs' beliefs arise because of their religious beliefs.

104.   Plaintiffs informed their Defendant employers of the conflict between their religious beliefs and receiving the Covid-19 vaccine.

105.   Title VII of the Civil Rights Act prohibits discrimination on the basis of religion. Id. § 2000e-2. The Act further requires covered employers to provide reasonable accommodation to their employees' sincerely held religious beliefs. Id. § 2000e(j).

106.   Title VII prohibits Defendants from scrutinizing what Defendants believe to be the sincerity of Plaintiffs' religious beliefs, or whether Plaintiffs' exercise of their beliefs is logical or as consistent as Defendants believe they should be.

107.   Guidance issued by the Equal Employment Opportunity Commission and decisions of the federal courts require that requests for reasonable accommodation be considered based on their individual, particularized circumstances, and that any claim of undue hardship or "direct threat" by the employer be assessed on a case-by-case basis rather than through application of a blanket rule.

108.   Plaintiffs, in their requests for accommodation from Defendants' Vaccine Mandate, made individualized requests for accommodation, but instead were terminated.

109.   In response to the Plaintiffs' requests for reasonable accommodation of their sincerely-held religious beliefs, Defendants and their ad hoc panel applied a uniform, blanket rule in rejecting nearly all, in violation of both Title VII and the EEOC's persuasive guidance on reasonable accommodation.

110.   Despite the Plaintiffs' consistent offers to engage in dialogue, and request for a religious accommodation, Defendants refused throughout to engage in the interactive process and instead applied a uniform, blanket rule in rejecting each Plaintiff's requests for an exemption for identical reasons as other Defendants' employees using an identical form letter.

111.    As set forth above, Defendants could have accommodated Plaintiffs'
requests for religious exemptions without suffering any undue hardship by having them
continue to do their jobs the same as they had done for the last one and one-half years of
their employment.

112.    Defendants' actions constitute discrimination on the basis of religion and
failure to accommodate, all in violation of 42 U.S.C. §§ 2000(e)-2 and 2000(e)(j).

113.    Because of Defendants' unlawful actions, Plaintiffs suffered and continue
to suffer economic and other damages in amounts to be proven at trial, including front
pay, back pay, emotional distress damages, compensatory damages, punitive damages,
and attorney fees in excess of $75,000.

## SECOND CAUSE OF ACTION

### Discrimination and Failure to Accommodate under the ADA,
### 42 U.S.C. § 12101 et seq.

114.    Plaintiffs restate and reallege all previous allegations as if fully set-forth
herein.

115.    Each Defendant is an "employer" within the meaning of 42 U.S.C. §
12111(5)(A).

116.    Each Plaintiff is an "employee" within the meaning of 42 U.S.C. §
12111(4).

117.    The ADA provides a general prohibition against discrimination that "shall
include medical examinations and inquiries by an employer."  42 U.S.C. §12112(d)(1).

118.    The ADA, at 42 U.S.C. § 12112 (d)(4)(a), prohibits employers from requiring current employees to undergo medical examinations or inquires unless it is job related and consistent with business necessity.

119.    Defendants' Vaccine Mandate violated 42 U.S.C. § 12112 (d)(4)(a), by requiring their employees to vaccinate, by requiring weekly testing, and by terminating Plaintiffs.

120.    Defendant Mayo's Vaccine Mandate policy requirement was neither job related nor consistent with business necessity, and therefore violated 42 U.S.C. § 12112 (d)(4)(a).  Since the Covid-19 vaccine did not prevent infection or transmission of Covid-19 by the vaccinated, particularly the dominant Delta and Omicron variants at the time of Plaintiff's termination, the discrimination between the vaccinated and the unvaccinated violated the ADA.

121.    As a result of Defendants' wrongful actions, Plaintiffs suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

## THIRD CAUSE OF ACTION
### Breach of Contract/Promissory Estoppel

122.    Plaintiffs restate and reallege all previous allegations as if fully set-forth herein.

123.    Defendants had a policy of honoring diversity, equity and inclusion, including the protection of the religious rights of its employees.

124.    Defendants wrote that it "is committed to upholding laws prohibiting discrimination and/or harassment on the basis of race, color, creed, religion, gender, age, national origin, marital status, sexual orientation, veteran's status, disability, or status with regard to public assistance." (emphasis added).

125.    Defendants' policies and statements created a contract between them and their employees.

126.    Defendants' actions in terminating Plaintiffs, and discriminating against them on the basis of their religious beliefs, constitutes a breach of that contract.

127.    Plaintiffs have been damaged by Defendants' breaches of contract.

128.    In the alternative, Defendants' promises to their employees, both written and verbal, created an expectation on which the employees, including Plaintiffs, relied to their detriment. Defendants' promises to their employees, including Plaintiffs, should be enforced to avoid injustice.

## FOURTH CAUSE OF ACTION

**State law religious discrimination claim under MHRA, Minn. Stat. § 363A.08**

**Plaintiff Walz**

129.    Plaintiffs restate and reallege all previous allegations as if fully set-forth herein.

130.    Minn. Stat. § 363A.01, et seq. prohibits discrimination in employment based on religion.

131.    Defendant Mayo is an "employer" within the meaning of Minn. Stat. §363A.01.

132.    Plaintiff Walz is an "employee" within the meaning of Minn. Stat. §363A.01.

133.    Plaintiff Walz has a sincerely held religious belief which prevented her from receiving the Covid-19 vaccine.

134.    Plaintiff Walz informed Defendant of the conflict between the Plaintiff Walz's religious beliefs and the Vaccine Mandate.

135.    Minn. Stat.§ 363A.01 et seq. prohibits discrimination on the basis of religion and further requires covered employers to respect their employees' sincerely held religious beliefs.

136.    Minn. Stat.§ 363A.01 et seq. prohibits Defendant from scrutinizing what it believes to be the sincerity of Plaintiff Walz's religious beliefs, or whether Plaintiff Walz's exercise of her beliefs is logical or as consistent as Defendant believes they should be.

137.    In response to Plaintiff Walz's requests for respect of her sincerely-held religious beliefs, Defendant rejected Plaintiff Walz's request for a religious exemption. The religious exemptions granted were frequently those of employees with less seniority and therefore at a lower wage, evidencing discriminatory intent.

138.    Despite Plaintiff Walz's requests for Defendant to engage in dialogue, Defendant refused throughout to engage in the interactive process, and instead rejected Plaintiff Walz's requests for religious exemptions for unspecified or generalized reasons.

139.    Defendant's actions constitute discrimination on the basis of religion in violation of Minn. Stat. § 363A.01 et seq.

140.    Because of Defendant's unlawful actions, Plaintiff Walz has suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues for which they have a right to trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs above-named prays for judgment in their favor and against Defendants and for an Order of the Court as follows:

1.    Adjudging that Defendants are liable to Plaintiffs for their actual damages in an amount to be proven at trial, including front pay, back pay, treble damages and statutory penalty, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, and any damages or penalties available at law;

2.    Enjoining Defendants from taking further illegal action against Plaintiffs in violation of both state and federal law, and Ordering Defendants to take action to restore Plaintiffs to their positions they would have enjoyed absent Defendants' illegal conduct;

3.    Awarding Plaintiffs their costs, attorney fees, prejudgment interest, and any other relief permitted by statute; and

4.   Awarding such other relief as the Court may deem just and equitable, including, without limitation, an injunction prohibiting differences in treatment between the vaccinated and unvaccinated which do not have a scientific basis.

Dated: January 18, 2023

*s/Gregory M. Erickson*
Gregory M. Erickson, 276522
Vincent J. Fahnlander, 19220X
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Email: erickson@mklaw.com
Email: fahnlander@mklaw.com
*Attorneys for Plaintiffs*